**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

NATALIE LAFAVE and NICOLAS LAFAVE,

Plaintiffs,

v.

LMH MILITARY PROPERTY MANAGEMENT LP, *et al.*,

Defendants.

Case No. 26-cv-03519-BAS-JLB

**ORDER GRANTING PLAINTIFFS' MOTION TO REMAND (ECF No. 7)**

Before the Court is Plaintiffs Natalie LaFave and Nicolas LaFave's motion to remand the current action to state court ("Motion to Remand"). (ECF No. 7.) For the reasons below, the Court **GRANTS** Plaintiffs' Motion to Remand. (*Id.*) The Court thus **REMANDS** this case to the Superior Court of California, County of San Diego. The Clerk of Court is **DIRECTED TO CLOSE** the present action.

## I. BACKGROUND

Plaintiffs filed this action against Defendants LMH Military Property Management LP ("LMPM") and San Diego Family Housing, LLC ("SDFH") in the San Diego Superior Court, asserting that Defendants' residential premises at the Howard Gilmore military housing community ("Howard Gilmore") were unsafe, and the unsafe conditions (*i.e.*,

failed window fall prevention device) led to the death of Plaintiffs' 30-month-year-old son, Kent Adam LaFave. (ECF No. 1-2 ¶¶ 1–31.)

More specifically, Plaintiffs allege their window in their second floor living room had a window fall prevention device installed, but it "ceased to consistently function" in preventing the window from being opened beyond four inches without manual disengagement. (*Id.* ¶¶ 23–24.) Plaintiff Nicolas LaFave opened the subject window and did not manually disengage the device. (*Id.* ¶¶ 29–31.) Kent LaFave fell through the subject window shortly afterwards and incurred life-threatening injuries, later leading to his death. (*Id.* ¶¶ 29–31.)

In their complaint, Plaintiffs bring a single cause of action for wrongful death—alleging Defendants breached their duties to Plaintiffs to keep Howard Gilmore in a safe condition (*i.e.*, by repairing broken window fall prevention devices), to conduct reasonable inspections, and to warn Plaintiffs of the dangers of broken window fall prevention devices. (*Id.* ¶¶ 32–44.)

Defendants removed the action from state court to this Court and filed an answer to Plaintiffs' Complaint. (ECF Nos. 1, 2.) Plaintiffs filed a motion to remand this action to state court. (ECF No. 7.) Defendants opposed. (ECF No. 10.) Plaintiffs replied. (ECF No. 18.)

## II. LEGAL STANDARD

A defendant may remove a civil action from state court to federal court. 28 U.S.C. § 1441(a). "The removal statute is strictly construed against removal jurisdiction, and the burden of establishing federal jurisdiction falls to the party invoking the statute." *Acad. of Country Music v. Cont'l Cas. Co.*, 991 F.3d 1059, 1061 (9th Cir. 2021) (citation omitted). "[A]ny doubt about the right of removal requires resolution in favor of remand." *Moore-Thomas v. Alaska Airlines, Inc.*, 553 F.3d 1241, 1244 (9th Cir. 2009). Removal is proper when the federal courts have original jurisdiction over the state court action. 28 U.S.C. § 1441(a). District courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331; *see also Republican*

*Party of Guam v. Gutierrez*, 277 F.3d 1086, 1088–89 (9th Cir. 2002) ("A case 'arises under' federal law either where federal law creates the cause of action or where the vindication of a right under state law necessarily turn[s] on some construction of federal law"). "A motion to remand is the proper procedure for challenging removal." *Moore-Thomas*, 553 F.3d at 1244.

On a motion to remand, this Court must resolve all disputed questions of fact and any ambiguities of law in favor of the non-removing party. *Rader v. Sun Life Assur. Co. of Canada*, 941 F. Supp. 2d 1191, 1194 (N.D. Cal. 2013) (citing *Good v. Prudential Ins. Co. of Am.*, 5 F. Supp. 2d 804, 807 (N.D. Cal. 1998)).

Defendants removed this case to federal court based on federal officer jurisdiction, 28 U.S.C. 1442(a)(1). (ECF No. 1.) "To protect the Federal Government from state-court 'interference with its operations,' Congress has given federal courts jurisdiction over some suits against federal officers or those acting under them." *Chevron USA Inc. v. Plaquemines Par., Louisiana*, 608 U.S. 1, 5 (2026) (citing *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150 (2007)).

**III. ANALYSIS**

Under the federal officer removal statute, a removing defendant must satisfy three requirements. *Plaquemines Par., Louisiana*, 608 U.S at 5. First, the removing defendant must be the United States, a federal agency, a federal officer, or a person "acting under" a federal officer, such as certain private parties hired to assist federal officers. *Id.* (citing *Watson*, 551 U.S. at 148–53). Second, the suit must be "for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). Third, the removing defendant must assert "a colorable federal defense." *Mesa v. California*, 489 U.S. 121, 129 (1989); *see id.* at 136–37 (grounding this requirement in Article III of the Constitution).

"For a private entity to be acting under a federal officer, the private entity must be involved in an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1099 (9th Cir. 2018). "Acting under" a federal officer includes when the private person: (1) "act[s] on behalf of the officer

in a manner akin to an agency relationship"; (2) "is subject to the officer's close direction, such as acting under the subjection, guidance, or control of the officer, or in a relationship which is an unusually close one involving detailed regulation, monitoring, or supervision"; or (3) "assist[s] the federal officer in fulfilling basic governmental tasks that the Government itself would have had to perform if it had not contracted with a private firm." *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 756 (9th Cir. 2022) (internal quotation marks and citations omitted).

***Plaquemines*** **Does Not Overrule Ninth Circuit Precedent**

As a threshold matter, Defendants argue that a recent United States Supreme Court case, *Plaquemines Par., Louisiana*, clearly establishes three prongs for removal and that Ninth Circuit cases applying the "causal nexus" standard—which purportedly conflates the first and second prongs for federal officer removal—are now overruled to the extent they pre-date *Plaquemines Par., Louisiana*. (*See* ECF No. 10 at 4:3–5:3 (citing *Lake v. Ohana Mil. Cmtys., LLC*, 14 F.4th 993, 1004–05 (9th Cir. 2021)).)

However, the Court disagrees for two reasons. First, Ninth Circuit precedent applying the "causal nexus" standard separately analyzes whether the defendant is "acting under" a federal officer and whether the act is pursuant to "any act under color of such office"—meaning the "causal nexus" standard does not directly contradict the three-pronged approach set forth in *Plaquemines Par., Louisiana*. *See Cnty. of San Mateo*, 32 F.4th at 755–60 (holding "[t]o demonstrate a causal nexus, the private person must show: (1) that the person was 'acting under' a federal officer in performing some 'act under color of federal office,' and (2) that such action is causally connected with the plaintiff's claims against it" and finding against federal officer removal when defendant failed to meet its burden to prove it was "acting under" a federal officer) (citing *Goncalves ex rel. Goncalves v. Rady Child.'s Hosp. San Diego*, 865 F.3d 1237, 1244–50 (9th Cir. 2017)).

Second, the Court agrees with Plaintiffs that *Plaquemines Par., Louisiana* only decided upon the second prong for federal officer removal ("for or relating to any act under color of . . . office") and expressly assumed without deciding that the defendant had met

the first prong ("acting under") (ECF No. 18 at 2:15–4:12). *See Plaquemines Par., Louisiana*, 608 U.S. 1, 10 n.2 ("No party disputes that Chevron acted under a federal officer in that capacity. We assume, without deciding, that it did.").

Since the U.S. Supreme Court did not address the first prong of federal officer removal, this Court disagrees with Defendants that *Plaquemines Par., Louisiana* directly overrules any Ninth Circuit precedent assessing that prong.

**Whether Defendants "Act Under" the U.S. Navy**

**1. Contracts Do Not Provide Defendants "Act Under" the U.S. Navy**

As private parties, Defendants must demonstrate that they were "involved in an effort to assist, or to help carry out, the duties or tasks of the federal superior" to satisfy the "acting under" requirement of § 1442(a)(1). *Fidelitad*, 904 F.3d at 1099; *Riggs v. Airbus Helicopters, Inc.*, 939 F.3d 981, 985 (9th Cir. 2019). One key consideration is whether the private person is assisting the federal officer in fulfilling "basic governmental tasks" that "the Government itself would have had to perform" if it had not contracted with a private firm. *Cnty. of San Mateo*, 32 F.4th at 756–57 (quoting *Watson*, 551 U.S. at 153–54); *Goncalves*, 865 F.3d at 1246–47 (holding that private person fulfilled a basic governmental task by pursuing subrogation claims on behalf of a government agency).

Here, Defendants claim that through their contracts with the U.S. Navy "with the express purpose of operating and managing Navy military housing" (ECF No. 10 at 9:13–18), Defendants "act under" the U.S. Navy and fulfill a "basic governmental task" the U.S. Navy would otherwise have to do itself. *Watson*, 551 U.S. at 153–54.

Because Defendants have exclusive management and control over the day-to-day operations of Howard Gilmore, the Court finds that Defendants do not "act under" the U.S. Navy. "A person is not 'acting under' a federal officer when the person enters into an arm's-length business arrangement with the federal government or supplies it with widely available commercial products or services." *Cnty. of San Mateo*, 32 F.4th at 757–58 (holding defendant was not "acting under" a federal officer by supplying gasoline and diesel fuel to the U.S. Navy pursuant to fuel supply contracts because fuel is a "generally

available commercial product[],” despite contractual provisions requiring compliance with certain industry fuel standards and giving the U.S. Navy the “right to inspect delivery, site, and operations.”).

By contrast, a defendant is “acting under” a federal agency where the defendant is directly controlled by the federal agency or acting pursuant to the federal agency’s instructions. *See Goncalves*, 865 F.3d at 1248 (finding defendants were “acting under” the federal Office of Personnel Management (“OPM”) where the OPM contracted with the defendants to administer a health insurance plan for federal employees under the Federal Employee Health Benefit Act and, crucially, making a “reasonable effort” to pursue subrogation claims against plaintiff was part of defendants’ contractual duties); *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 727–30 (9th Cir. 2015) (holding that where contractor defendant’s plan to destroy seized fireworks went awry, defendant was not acting under a federal officer because the Government did not dictate or control the contractor’s plan for destroying the fireworks); *see also State v. Monsanto Co.*, 274 F. Supp. 3d 1125, 1131 (W.D. Wash. 2017), *aff’d*, 738 F. App’x 554 (9th Cir. 2018) (“[E]ven if the government contracted for Monsanto’s PCBs, the Court cannot say that Monsanto was ‘acting under’ a federal agency where the government did not direct Monsanto to produce and promote PCBs *in a particular way*.”).

The present case is analogous to *Lake*—wherein the Ninth Circuit found housing defendants did not “act under” a federal officer when the U.S. Navy formed a public-private venture to build housing on a military base because the venture’s operating agreement gave “sole and exclusive management and control” to the private partner. 14 F.4th at 999, 1004–05. According to Defendants’ own briefing (ECF No. 10 at 14:13–22), though the U.S. Navy previously managed Howard Gilmore directly, the U.S. Navy transferred daily management duties of U.S. military housing to private housing authority SDFH following the Military Housing Privatization Initiative, 10 U.S.C. §§ 2871–85, in 2001. The new public-private venture is governed by three agreements (collectively, “Agreements”):

(1) **The "Operating Agreement"**: A joint venture agreement between the U.S. Navy and LMPM establishing that LMPM operates the housing and that LMPM needs to seek written consent from the U.S. Navy for major decisions (*e.g.*, corporate governance or filing for bankruptcy) (Ex. A, ECF No. 12-1);

(2) **The "Leasing Agreement"**: A leasing agreement between the U.S. Navy and LMPM in which the U.S. Navy—as land-owner—leases the underlying land to LMPM for no cash rent, in exchange for LMPM's agreement to build, renovate, operate, and maintain housing at no expense to the U.S. Government, and providing that LMPM bears maintenance liability (Ex. B, ECF No. 12-2);

(3) **The "Property Management Agreement"**: An agreement between LMPM and SDFH providing SDFH a fixed percentage of gross collections in exchange for SDFH managing the day-to-day operations of Howard Gilmore (*e.g.*, renting units to military and non-military tenants, staffing, annual operating and renovation budgets, leasing, hiring and paying employees and contractors, and maintenance and repair) (Ex. C, ECF No. 12-3).

Following *Lake*, the Court finds that the U.S. Navy's property interests in the underlying land and power to withhold consent over structural aspects of a private housing arrangement do not amount to directing Defendants how to run the day-to-day operations of Howard Gilmore such that Defendants "act under" the U.S. Navy. 14 F.4th at 1004–05.

Indeed, the Agreements expressly provide that Defendants do not need direct permission from the U.S. Navy for routine property maintenance, such as conducting window fall prevention device repairs (*see* Ex. A §§ 5.01(b), 5.12, Article 10; Ex. C §§ 2.1.6(a)–(b)). *See United States v. King Features Ent., Inc.*, 843 F.2d 394, 398 (9th Cir. 1988) ("Interpretation of a contract is a matter of law."). More specifically, Section 5.01(b) of the Operating Agreement explicitly grants LMPM "exclusive management and control of the business" beyond that which is explicitly in the domain of the U.S. Navy consent power (*see* Ex. A § 5.12) and bankruptcy-remoteness provisions (*see* Ex. A, Article 10). The list of actions in the U.S. Navy's domain in Section 5.12 of the Operating Agreement

does not include anything relating to managing routine repairs or installations. In addition, the Property Management Agreement provides that SDFH is responsible for keeping Howard Gilmore "in good, safe and clean condition and repair." (Ex. C § 2.1.6(a).) Furthermore, SDFH is explicitly granted discretion to spend thousands of dollars per instance of routine repair, funded by LMPM, without seeking consent. (*Id.*) If a broken device presents "immediate danger to persons," SDFH can even spend outside the budget upon attempting to consult LMPM beforehand and notifying LMPM afterward. (Ex. C § 2.1.6(b).) No routine or individual repairs explicitly require permission from the U.S. Navy. (*See* Ex. A § 5.12.)

Relatedly, though Defendants argue they serve a governmental function through the act of providing military housing (which was previously provided by the U.S. Government) (*see* ECF No. 10 at 9:13–18, 14:13–22), *Lake* held that "[m]erely leasing housing to a servicemember cannot itself be a governmental function." 14 F.4th at 1005. In addition, Congressional acts to privatize military housing—"allowing private companies to own and manage housing on military installations"—do not render those private companies' housing management a governmental function. *Id.*

*Lake* provided the caveat that "there may be situations where leasing housing on a military installation might perform a governmental function," but Defendants would need to show they "perform[] a governmental function in this specific factual context." 14 F.4th at 1006. Here, the Court agrees with Plaintiffs that Defendants have not shown that they are performing a "governmental function"—as opposed to exercising discretion over routine repair as part of their standard landlord duties—when they allegedly did not repair Plaintiffs' broken window fall prevention device. (ECF No. 7-1 at 8:19–9:12.)

Moreover, the present case is distinct from contrary Ninth Circuit precedent because here, providing military housing does not involve a "strong and distinctly federal interest[]," and Defendants' contracts with the U.S. Navy do not instruct Defendants to act as an agent on behalf of the U.S. Navy. *See Goncalves*, 865 F.3d at 1246–48 (finding private insurer was "acting under" OPM where binding precedent has treated pursuing

subrogation claims as a distinctly federal interest, and where the contracts with OPM advised the private insurer on strategies for pursuing subrogation claims).

Thus, the Court finds the Agreements provided by Defendants amount to an "arm's-length business arrangement" with the U.S. Navy, rather than Defendants "acting under" the U.S. Navy. *Cnty. of San Mateo*, 32 F.4th at 757–58.

**2. Compliance with the U.S. Navy's Window Fall Prevention Device Program**

Defendants also argue they "act under" the U.S. Navy by installing window fall prevention devices pursuant to the U.S. Navy's Window Fall Prevention Device Program (ECF No. 10 at 2:9–3:1) and contractual terms purportedly requiring Defendants to comply with Navy regulations (*id.* at 8:23–10:5). The main issue here is whether Defendants' actions taken pursuant to the U.S. Navy's Window Fall Prevention Device Program constitute directives from the U.S. Navy such that Defendants "act under" the U.S. Navy.

Contrary to Defendants' theory, courts have generally held that merely acting in compliance with federal regulations or agency directives does not entail performing a "basic governmental task"—and thus, does not constitute "acting under" a federal officer. *See Fidelitad*, 904 F.3d at 1099 (holding a drone manufacturer—which sold drones to both military and civilian consumers—was not "acting under" a federal officer when delaying shipment of a civilian drone order to verify federal export licensing compliance, in the absence of direct orders from a federal officer or agency); *cf. Riggs*, 939 F.3d at 990 (finding "an aircraft manufacturer does not act under a federal officer when it exercises designated authority to certify compliance with governing federal regulations," despite the manufacturer's need to obtain the consent of a federal agency prior to making structural or design changes to its aircraft).

Although Defendants claim they communicated with the U.S. Navy regarding compliance with the U.S. Navy's Window Fall Prevention Device Program (ECF No. 10-1 ¶¶ 12–13) and a U.S. Navy representative inspected the windows at Howard Gilmore to comply with the Program (*id.* ¶ 15), the Ninth Circuit has found that "highly detailed"

regulation and "highly supervised and monitored" activities are alone insufficient to demonstrate defendants "act[ed] under" a federal agency. *Fidelitad*, 904 F.3d at 1099–1100.

Rather, Defendants must demonstrate that the U.S. Navy has enlisted Defendants to perform a key governmental duty. *See Watson*, 551 U.S. at 156 (finding the absence of a "formal delegation" of authority dispositive, including "any contract, any payment, any employer/employee relationship, or any principal/agent arrangement"); *Riggs*, 939 F.3d at 988 (adopting the Seventh Circuit's interpretation of *Watson* that a "power to issue *conclusive* certification of compliance" is a delegation of "rule making" authority, whereas the power to self-certify non-binding compliance is not).

Defendants' exhibits demonstrate that their communications with the U.S. Navy largely constitute guidance for installing compliant window fall prevention devices. For example, the U.S. Navy sent letters to all private housing partners: informing them of modifications to regulatory requirements for window fall prevention devices (ECF No. 10-3), encouraging window safety (ECF No. 10-4), and describing requirements to comply with the Window Fall Prevention Device Program (ECF Nos. 10-5, 10-6). The U.S. Navy also emailed its private housing partners recommending three program-compliant devices and encouraging them to develop their own plans to complete device installation. (ECF No. 10-7.)

Although the U.S. Navy's communications contain detailed instructions, conspicuously missing from these documents is any explicit delegation of the U.S. Navy's authority for Defendants to determine compliance or to act on behalf of the U.S. Navy when installing or repairing the relevant devices. *See Herring v. Californian-Magnolia Convalescent Hosp., Inc.*, No. EDCV 22-44 JGB (KKx), 2022 WL 743515, at *4 (C.D. Cal. Mar. 11, 2022) ("A facility's compliance with federal directives, memoranda, and additional regulations and recommendations is insufficient to show that it was conscripted to assist a federal officer or agency in performance of a government duty.") (*citing Saldana v. Glenhaven Healthcare LLC*, 27 F.4th 679, 684–85 (9th Cir. 2022)).

Moreover, Defendants' alleged responsibilities to warn, inspect, repair, and maintain window safety devices at issue in this case (*see* ECF No. 1-2) seemingly derive from their landlord relationship with Plaintiffs—rather than any communications from the U.S. Navy regarding window safety. *See Lake*, 14 F.4th at 1005 ("Requiring federal agency consent on collateral points falls within the simple compliance with the law circumstance that does not meet the acting under standard.") (citation modified). For example, though Defendants' cited communications with the U.S. Navy specify the device category, the qualifying-window thresholds, funding, deadlines, and reporting, they do not contain instruction on installation methodology. (*See* ECF Nos. 10-3, 10-4, 10-5, 10-6, 10-7, 10-10.) Furthermore, the U.S. Navy's resident-communication materials postdate Plaintiffs' tenancy: the "Lock in Safety" strategy is dated July 15, 2025, after Plaintiffs moved in, and the CNIC letter is dated November 2025. (*See* ECF Nos. 10-8, 10-10.) The warnings Plaintiffs received were Defendants' own forms—and even explicitly represent non-compliance with the U.S. Navy's sill height standards. *Compare* ECF No. 10-2 at 79 (Defendants' materials communicated to residents that only windows with sill heights of 25 inches or lower have devices) *with* ECF No. 10-3 at 2 (U.S. Navy instructed its private housing partners that windows with sill heights 42 inches or less off the floor should have devices installed to be compliant).

Thus, the Court finds that Defendants' communications with the U.S. Navy constitute "mere compliance" with the Window Fall Prevention Device Program and do not transform Defendants' relationship with the U.S. Navy from an "arm's-length transaction" to provide military housing to one where Defendants "act under" the U.S. Navy.

* * *

For the reasons above, the Court finds that Defendants do not demonstrate they were "acting under" the U.S. Navy when failing to repair the window fall prevention device in Plaintiffs' apartment. Thus, Defendants fail to meet the first requirement of federal officer removal jurisdiction. *Plaquemines Par., Louisiana*, 608 U.S at 5. Since the removing

defendant must satisfy all three requirements of federal officer removal, *id.*, the Court **GRANTS** Plaintiffs' Motion to Remand. (ECF No. 7.)

## IV. CONCLUSION

For the reasons above, the Court **GRANTS** Plaintiffs' Motion to Remand. (ECF No. 7.) The Court thus **REMANDS** this case to the Superior Court of California, County of San Diego. The Clerk of Court is **DIRECTED TO CLOSE** the present action.

**IT IS SO ORDERED.**

**DATED: September 21, 2026**

Cynthia Bashant

**Hon. Cynthia Bashant, Chief Judge**
**United States District Court**